IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

LOUIS ARTIS,

      Plaintiff,

v.                                    No. 13-1090

FINISHING BRANDS HOLDINGS, INC.,

      Defendant.

_____

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
_____

*Introduction*

Before the Court is Defendant, Finishing Brands Holdings, Inc.'s ("FB"), motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Docket Entry ("D.E.") 47.) Plaintiff, Louis Artis ("Artis"), filed a response to which FB replied. (D.E. 56, 84.) Plaintiff also submitted a sur-reply. (D.E. 88.) For the reasons discussed below, Defendant's motion is GRANTED.

*Evidentiary Matters*

**A.**    **Plaintiff's Objections to Defendant's Statement of Undisputed Material Fact**

Plaintiff objects to the conciseness of several paragraphs found in Defendant's Statement of Undisputed Material Fact ("SUMF"). (*See* D.E. 57 ¶¶ 4, 6–10, 12, 19–20, 23–24, 32–35, 38, 40–45, 47, 60.) In this district, the party moving for summary judgment, "[i]n order to assist the Court in ascertaining whether there are any material facts in dispute," is required to provide "a separate, concise statement of the material facts as to which the moving party contends there is no genuine issue for trial." LR 56.1(a), Local Rules of the United States District Court for the

Western District of Tennessee ("Local Rules"). Any objections to evidentiary materials offered in support of, or in opposition to a summary judgment motion, must be included in the response and identify the rule of evidence or other authority that establishes that evidence's inadmissibility. *See* Local Rule 56.1(e).

The local rules, and opinions from this district, do not define "concise statement." However, in denying a plaintiff's motion to strike a portion of the defendant's statement of undisputed material fact on conciseness grounds, the United States District Court for the Middle District of Tennessee held that the defendant did not violate that district's similarly-worded local rule because the employment dispute at issue involved several incidents occurring over a period of time. *See Thompson v. Davidson Transit Org.*, 740 F. Supp. 2d 938, 938–39 (M.D. Tenn. 2010). Similarly, this case involves allegations of employment discrimination covering an extended period of time. Defendant's SUMF is not unnecessarily lengthy—it is ten pages long, and consists of sixty numbered paragraphs that address the relevant facts underlying this lawsuit. Plaintiff's objections are OVERRULED.

Artis also alleges that Defendant's SUMF ¶ 48 is inadmissible. (D.E. 57 ¶ 48.) The SUMF states that the Employment Opportunity Commission ("EEOC") dismissed Plaintiff's EEOC charge, finding no evidence of discrimination. "A trial court has the discretion to allow an EEOC determination into evidence, even though these determinations are not *per se* admissible in all civil rights suits." *Blakely v. City of Clarksville*, 244 F. App'x 681, 683 (6th Cir. 2007); *Alexander v. CareSource*, 576 F.3d 551, 562 (6th Cir. 2009). While the EEOC's determination is not material to the Court's resolution of this matter, Plaintiff's objection is OVERRULED.

**B.**     <u>**Defendant's Objections to Plaintiff's Responses to Defendant's SUMF**</u>

FB moves the Court to strike[1] or disregard paragraphs 5, 10, 12–13, 17, 19, 23, 31, 33, 39, 42–45, 47, 50, 52–53, 56 and 59 of Plaintiff's responses to its SUMF because they are irrelevant, legal conclusions, opinions, and/or speculation and therefore inconsistent with Local Rule 56.1(b).  (D.E. 84 at 1–3.)  Plaintiff insists these responses are the only way to present all of the necessary facts to defeat Defendant's motion.  (D.E. 88 at 1–3.)  Upon review of Artis's responses, the Court finds paragraphs 31, 37, 42, 53–54, and 58 of Defendant's SUMF undisputed, for the purposes of this motion, because he failed to provide record citations to support the disputed nature of these facts.  *See* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . (2) consider the fact undisputed for the purposes of the motion[.]").

As to Plaintiff's remaining responses, Local Rule 56.1(b) provides that non-movants "must respond to each fact set forth by the movant by either: (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purposes of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed."  Local Rule 56.1(b).  The disputed facts must be accompanied by "specific citations to the record supporting the contention that such fact is in dispute."  *Id.*  The non-movant's response "may contain a concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried."  *Id.*  The Court will examine each response to determine if it complies with Local Rule 56.1(b) and/or Fed. R. Civ. P. 56.

**Paragraph 5.**  Plaintiff disputes Defendant's SUMF that it does not have a formal position of Assistant Cell Leader by citing his job application for the Cell Leader position, Defendant's

---

[1] The Court notes that "striking" the Plaintiff's responses would not be procedurally proper because only pleadings are attackable through a motion to strike.  *See Johnson v. Total Renal Care, Inc.*, No. 1:11-cv-01047-JDB-egb, 2012 WL 896148, at *1 n.2 (W.D. Tenn. Mar. 15, 2012).

policy of paying employees who temporarily fill-in as Cell Leader a higher rate, and his allegation that he was stripped of his assistant Cell Leader duties after complaining about racial discrimination at work. (D.E. 57 ¶ 5.) The evidence relied on by Artis does not demonstrate that this fact is disputed. He admits Defendant had a policy of paying employees who temporarily filled-in as Cell Leaders a higher rate. (Dep. of Louis Artis ("Artis Dep.") at 226–27, D.E. 50.) However, when the Cell Leader returned, that employee stopped receiving higher pay. (*Id.*) None of this evidence demonstrates that "Assistant Cell Leader" was an official position at Defendant's Jackson, Tennessee facility. Therefore, the Court treats this SUMF as undisputed for the purposes of this motion.

**Paragraph 10.** Artis disputes Defendant's SUMF that he had been encouraged by FB management to seek advancement in the company by citing to record evidence, including his deposition where he testified that, after expressing interest in the Department 2195 Cell Leader position, all encouragement ceased, and he experienced retaliation. (D.E. 57 ¶ 10.) However, Plaintiff also testified that he had received encouragement from his superiors to seek advancement. (Artis Dep. at 82–85, D.E. 50.) Regardless, the Court considers this SUMF disputed to the extent Plaintiff alleges there was a change in his treatment at work after expressing an interest in the Cell Lead position.

Plaintiff also disputes Defendant's SUMF that it approved and paid for him to attend a continuing education course by citing to the reimbursement records. (D.E. 57 ¶ 10.) That evidence does not put the SUMF in dispute. The records show that in 2011, Plaintiff completed a course with Defendant's approval. (*See* D.E. 50-1 at 13–14.) It is undisputed that Defendant reimbursed this cost. (*Id.*; Artis Dep. at 97–99, D.E. 50.) The remainder of Plaintiff's response to Defendant's SUMF alleges that the work environment changed after he expressed interest in

the Cell Leader position, and that Plaintiff had more education than Sherry Childs ("Childs"), the employee who received the promotion. (*See* D.E. 57 ¶ 10.) Therefore, the Court finds as undisputed, for the purposes of this motion, the fact that Plaintiff took a continuing education course and was reimbursed by Defendant. The Court recognizes Plaintiff's response comparing his educational background to Childs, and his response that Defendant treats African American employees differently.

**Paragraph 12.** Artis disputes Defendant's SUMF listing the numerical score and pay raise he received following his 2011 annual performance evaluation by referencing complaints his supervisor, Tom Weaks ("Weaks"), wrote on the evaluation concerning Plaintiff's lack of organizational skills and trouble-shooting capabilities. (D.E. 57 ¶ 12.) The evidence Plaintiff relies on does not call in to dispute the fact that he was evaluated on March 14, 2012 and given that numerical score and pay raise. It is uncontested that, on the same day, Plaintiff conducted a self-evaluation and gave himself the numerical score listed in Defendant's SUMF. Therefore, the Court treats these facts as undisputed for the purposes of this motion. The Court recognizes Plaintiff's response disputing the basis for Weaks's written complaints on his 2011 evaluation.

**Paragraph 13.** Plaintiff disputes Defendant's SUMF listing the numerical score Childs received on her 2011 annual evaluation. (D.E. 57 ¶ 13.) He does not provide any evidence challenging the accuracy of this score, but instead offers argument alleging that Weaks gave Childs a higher score to support his decision to promote her to Cell Leader. (*Id.*) Therefore, the Court treats this fact as undisputed for the purposes of this motion, and recognizes Plaintiff's response concerning Weaks's allegedly improper motives.

**Paragraph 17.** Plaintiff contests Defendant's SUMF that the reasons Weaks promoted Childs were her superior assembly and organizational skills by citing to former FB employee Jerry

Day's ("Day") deposition, the Department 2195 Cell Leader job description, the interview matrices, and other record evidence. (D.E. 57 ¶ 17.) His response lays out, in detail, his argument that Weaks's reasons for promoting Childs were pretextual. This text is taken almost verbatim from Plaintiff's response to Defendant's motion for summary judgment. (*See* D.E. 56 at 6–9.) Therefore, the Court considers this fact undisputed to the extent Weaks stated those were his reasons for promoting Childs, and recognizes Plaintiff's response contending those reasons were pretextual.

**Paragraph 19.** Plaintiff disputes Defendant's SUMF that Weaks told Plaintiff he was disorganized prior to interviewing him for the Cell Leader position by citing to his deposition and its exhibits. (D.E. 57 ¶ 19.) Therefore, the Court treats this fact as disputed.

**Paragraph 23.** Relying on the evidence cited in his response to paragraph 17, Plaintiff disagrees with Defendant's SUMF that Weaks made the decision to promote Childs based on, among other factors, his direct observation of her performance as her supervisor. (D.E. 57 ¶ 23.) Therefore, the Court treats this fact as undisputed that those were Weaks's stated reasons, and recognizes Plaintiff's response contending they were pretextual.

**Paragraph 33.** Plaintiff admits this fact is uncontested, but offers additional citations that expand on Childs's workplace behavior. (D.E. 57 ¶ 33.) Therefore, the Court treats this fact as undisputed and will consider the additional citations.

**Paragraph 39.** Artis disputes Defendant's SUMF that he never informed anyone at FB that he was offended by Childs's statements listed in SUMF ¶ 38 by citing his deposition. (D.E. 57 ¶ 39.) On pages 114–16 of his deposition, Plaintiff recalled a conversation he had with Day about alleged discrimination at FB. (*Id.*) However, this discussion occurred after Day's employment was terminated, so it does not dispute Defendant's SUMF. Plaintiff cites pages 191–93, but this

testimony focused on his complaints to FB management about other issues, not Childs's statements. Plaintiff cites page 204, but this testimony dealt with Plaintiff's concerns over Childs's promotion, not her statements. Plaintiff references pages 241–47, but he is describing his dissatisfaction with Weaks for never generally disciplining Childs, not her statements mentioned in Def.'s SUMF ¶ 38. Finally, Plaintiff cites pages 353–55, but nothing in that excerpt concerns reporting Childs's statements. Plaintiff does testify, however, that he never told Childs those comments were inappropriate. (*Id.* at 130–34.) He has failed to provide "specific citations to the record supporting the contention that such fact is in dispute." Local Rule 56.1(b). Therefore, the Court will treat this fact as undisputed for the purposes of this motion.

**Paragraph 43.** Artis differs with Defendant's SUMF that several FB employees saw a rubber chicken hanging by a noose in "funny places", and that the rubber chicken would be placed in different locations throughout the facility as a joke, by citing to depositions that described the chicken as offensive. (D.E. 57 ¶ 43.) Therefore, this fact is disputed for the purposes of this motion.

**Paragraph 44.** Plaintiff disputes Defendant's SUMF stating that Danny Selph is not a manager/supervisor by citing to depositions and other record evidence. (D.E. 57 ¶ 44.) The fact concerning Selph's employment rank is disputed for the purposes of this motion. Also disputed is Defendant's SUMF that Plaintiff never complained to anyone at FB after receiving two books from Selph, or that Selph is his supervisor. (*Id.*) It is undisputed, for the purposes of this motion, that Plaintiff never complained about receiving the books from Selph and that Selph never worked in Plaintiff's department or supervised him. (Artis Dep. at 247, 261–62, D.E. 50; Deposition of Danny Selph ("Selph Dep.") at 104, D.E. 70-3.) The Court recognizes Plaintiff's response alleging that he was offended after receiving the books.

**Paragraph 45.** Artis disagrees with Defendant's SUMF describing Selph's stated motivation for giving the books to the extent it infers that the books did not personally offend him, or that Selph has not made racist comments while working at FB, by citing to deposition excerpts, including Marcus Tyus's ("Tyus") deposition and Robert Williams's affidavit. (D.E. 57 ¶ 45.) However, the cited portions of Tyus's testimony do not mention Selph making any racist comments while working at FB. (*See* Dep. of Marcus Tyus ("Tyus Dep.") at 45–51, D.E. 69-1.) Williams's affidavit, as discussed below, is inadmissible, and, in any event, does not reference Selph making racist remarks, or displaying racism at work. (*See* D.E. 67-1.) Plaintiff cites four excerpts from his own deposition, but none address whether Selph made racially offensive remarks while employed at FB. The closest relevant testimony is him relaying a story Selph told co-workers about giving an African American female a ride home. (Artis Dep. at 297–98, D.E. 50.) Plaintiff testified that he was not sure if this was a true story or joke, and admitted he had no knowledge about the story's background. (*Id.*) Therefore, for the purposes of this motion, it is undisputed that Selph has not made racially offensive remarks in the past. The Court recognizes Plaintiff's response that he was personally offended after receiving the books.

**Paragraph 47.** Plaintiff does not dispute Defendant's SUMF that he only alleged Title VII racial discrimination in his June 26, 2012 EEOC charge, but notes that he brought a hostile work environment and retaliation claim under the THRA and Title VII in the present action.

**Paragraph 50.** Plaintiff does not dispute Defendant's SUMF that he never applied for a management position but adds that there are no African American managers at the Jackson, Tennessee facility. (D.E. 57 ¶ 50.) The Court recognizes Plaintiff's response and will consider it for the purposes of this motion.

**Paragraph 52.** Plaintiff disputes Defendant's SUMF that he has no personal knowledge of the rate at which African American employees are disciplined as compared to Caucasian employees by citing Day's deposition. (D.E. 57 ¶ 52.) The Court will address this statistical evidence.

**Paragraph 56.** Plaintiff disputes Defendant's SUMF that he has no personal knowledge of FB employing individuals in management/supervisory roles who are known to display racially discriminatory behavior by citing his discriminatory atmosphere evidence. (D.E. 57 ¶ 56.) The Court recognizes Plaintiff's response and will consider it for the purposes of this motion.

**Paragraph 59.** Plaintiff disputes Defendant's SUMF that since filing his EEOC charge he has not been disciplined to the extent the SUMF infers that management has not ignored his complaints of retaliation and racism. (D.E. 57 ¶ 59.) Plaintiff's response does not dispute the fact that, since filing his EEOC charge, he has not been formally disciplined. Therefore, the Court will consider this fact undisputed for the purposes of this motion and recognizes Plaintiff's response that he believes his complaints were being ignored.

## C.    Robert Williams's Affidavit

FB challenges Robert Williams's affidavit as being unsworn, lacking specificity, and containing conclusory allegations in violation of Fed. R. Civ. P. 56. (D.E. 84 at 3–4.) Under Rule 56, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). An affidavit must also be "sworn to before a notary public [or] signed under penalty of perjury pursuant to 28 U.S.C. § 1746." *CareToLive v. Food and Drug Admin.*, 631 F.3d 336, 345 (6th Cir. 2011).

Williams submitted an affidavit that he signed and dated on February 8, 2013. (D.E. 67-1.) The February 8 statement is not notarized or signed by Williams under penalty of perjury.

On November 17, 2014, he added the following notation: "I wrote this for Louis Artis on 2-8-13." This statement was notarized by a valid Tennessee notary public. However, the Court concludes that this affidavit should be disregarded for the purposes of this motion. *See Hart v. Lutz*, 102 F. App'x 10, 13 (6th Cir. 2004) (affirming district court's decision to disregard affidavits that were not sworn or otherwise subscribed pursuant to 28 U.S.C. § 1746, even though their certificates of service were sworn and notarized). Williams's affidavit presents a similar problem, as the statement describing discrimination at Defendant's Jackson, Tennessee facility was neither sworn nor otherwise subscribed. The only statement that was notarized is the November 17, 2014 statement, "I wrote this for Louis Artis on 2-8-13."

Additionally, even if the affidavit was properly executed, it is unclear how Williams has personal knowledge to testify on these matters because he failed to list his dates of employment, what position he held, or when this discrimination occurred. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration . . . must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Based on these circumstances, the Court will disregard Williams's affidavit for the purposes of this motion.

## Background

Since 2000, Artis, an African American male, had been employed at FB's Jackson, Tennessee facility that specializes in the manufacture of spray guns and fluid handling equipment for industrial finishing applications. (Def.'s SUMF ¶¶ 1–3, D.E. 48.) He began working as a machine operator and was later assigned to the buffing department. (*Id.* ¶¶ 3–4.) In August 2009, with the encouragement of FB's former human resources manager, Mitchell Hall ("Hall"), Plaintiff applied for an Assembler position in Department 2195's Pump Cell. (*Id.* ¶ 6.)

Artis was interviewed by Assembly Production Supervisor Tom Weaks ("Weaks"), who offered him the position, which he currently holds. (*Id.* ¶¶ 2, 7.) Sherry Childs ("Childs"), a Caucasian female, was already employed as an assembler in Department 2195 when Artis joined it. (*Id.* ¶ 8.) During this time, Department 2195 did not have a Cell Leader, so Weaks and the other assemblers—including Artis and Childs—performed the Cell Lead duties. (*Id.* ¶ 9.)

In 2011, with the support and encouragement of FB management, including Hall, Weaks, and Director of Manufacturing Bob Battle ("Battle"), Artis completed a continuing education course focusing on the fundamentals of supervision and management. (*Id.* ¶ 10.) On March 14, 2012, Weaks conducted the 2011 performance evaluation of Artis, giving him an overall score of 3.5/5.0, while Artis gave himself a similar score in his self-evaluation. (*Id.* ¶ 12.) On the same date, Weaks conducted Childs's 2011 performance evaluation, resulting in a score of 3.88/5.0. (*Id.* ¶ 13.)

Sometime in early March/late February 2012, Weaks, Battle and Kim Quick met to discuss potential job openings, including filling the still-vacant Cell Leader position in Department 2195. (Day Dep. at 84, D.E. 63-1; Weaks Dep. at 136–38, D.E. 61.) On March 1, 2012, Day sent an email to Human Resources Director Betty Schultz ("Schultz"), memorializing this meeting. (D.E. 65-2 at 29.) Day's email explained that "Bob met with Tom Weeks [sic] and Kim Quick to discuss their load. They recommend the following changes. . . . Post position of Cell Leader over pumps. Their recommendation is Sherry Childs. Not sure if I agree." (*Id.*)

On March 16, 2012, FB posted the Department 2195 Cell Leader position. (Def.'s SUMF ¶ 14, D.E. 48.) Artis and Childs applied and were interviewed by Weaks and Day. (*Id.* ¶ 15; Weaks Dep. at 85, D.E. 61.) Even though both were qualified, Weaks told Artis he chose Childs because she was his most skilled assembler and had better organizational skills. (Def.'s

SUMF ¶¶ 16–18.)  Despite Childs receiving the promotion, Weaks encouraged Artis to apply for future Cell Leader openings.  (*Id.* ¶ 27.)  The Department 2195 Cell Leader position is the only Cell Lead position Artis has applied for while employed by Defendant.  (*Id.* ¶ 29.)

After Childs's promotion, Artis's working relationship with her became "very difficult at times," with Childs criticizing his work to other employees in Department 2195, and being "snappy".  (*Id.* ¶ 32.)  Plaintiff complained about Childs's behavior to Weaks and Operations Manager Pete Kurtz ("Kurtz"), who suggested everyone meet to discuss the situation.  (*Id.* ¶ 33.)  Kurtz investigated Artis's complaints and held a meeting on September 30, 2013 with Weaks, Artis, and Childs.  (*Id.* ¶ 34; D.E. 50-1 at 42.)  There, the parties discussed their working relationship.  (Def.'s SUMF ¶ 34, D.E. 48.)  Both employees expressed their frustration with the other and apologized, with Artis stating there was no longer hostility between them.  (*Id.* ¶ 35.)

On June 26, 2012, Plaintiff filed a complaint with the EEOC, asserting that he was discriminated against based on his race by Defendant when he was not promoted to Cell Leader of Department 2195.  (*Id.* ¶ 47.)  Upon receiving his right-to-sue notice, he brought this action on March 12, 2013, alleging racial discrimination, a hostile work environment, and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, *et seq.*  (*See* D.E. 1.)

*Legal Standard*

Rule 56 provides in pertinent part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court is to "view facts in the record and reasonable inferences that can be drawn from those facts in the light most favorable to the nonmoving party."  *Canady v. Gillette Co.*, 546 F. App'x 670, 677 (6th Cir. 2013) (citing

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). It is not to "weigh evidence, assess credibility of witnesses, or determine the truth of any matter in dispute." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The court must determine "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014) (quoting *Anderson*, 477 U.S. at 251–52).

The moving party "has the initial burden of showing the absence of a genuine dispute as to a material fact." *Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 520 (6th Cir. 2014) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the motion is properly supported, "the opposing party must go beyond the contents of its pleadings to set forth specific facts that indicate the existence of an issue to be litigated." *Slusher v. Carson*, 540 F.3d 449, 453 (6th Cir. 2008) (citation omitted). The nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson*, 477 U.S. at 248–49. The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.* A court must grant summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

*Analysis*

## A. <u>Race Discrimination</u>[2]

---

[2] Artis failed to raise a mixed-motive claim in his complaint or responses to FB's summary judgment motion. Therefore, the Court will analyze his race discrimination allegation as a single-motive claim. *See Spees v. James Marine, Inc.*, 617 F.3d 380, 390 (6th Cir. 2010) ("Plaintiffs must give proper notice when bringing mixed-motive claims.").

Plaintiff insists that Defendant's failure to promote him to Cell Leader was race discrimination actionable under Title VII and the THRA. (Compl. ¶¶ 10–20, 28, D.E. 1.) Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The THRA does so as well. *See* Tenn. Code Ann. § 4-21-401(a)(1). The analysis for discrimination claims brought under Title VII and the THRA is the same. *See Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 757 (6th Cir. 2012) ("Tennessee courts look to federal cases applying federal anti-discrimination statutes as the baseline for interpreting and applying the THRA.").

In order to survive summary judgment on these claims, Artis "must present either direct or circumstantial evidence that [this] action[] [was] motivated . . . by racial animus." *Reed v. Procter & Gamble Mfg.*, 556 F. App'x 421, 428 (6th Cir. 2013). He does not present any direct discrimination evidence; therefore his claims will be assessed using the *McDonnell Douglas* burden-shifting framework. *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 347 (6th Cir. 2012) ("The three-step framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, L. Ed. 2d 668 (1973), guides the analysis of discrimination claims based upon circumstantial evidence."); *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007) (applying the *McDonnell Douglas* burden-shifting framework to THRA claims). If Artis can establish a prima facie case of racial discrimination, the burden of production shifts to FB to offer a legitimate, non-discriminatory reason for its decision to promote Childs over Artis. *Id.* He can then prevail by showing that FB's stated reason was pretextual. *Id.* The

plaintiff has the burden of persuasion at all times, regardless of which party bears the burden of production. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 675 (6th Cir. 2013).

For purposes of this motion, FB concedes that Artis can establish a prima facie case of race discrimination. (D.E. 47-1 at 4.) The parties dispute whether FB has provided a legitimate, non-discriminatory reason for promoting Childs over Artis, and whether Artis has shown that that FB's reasons were pretextual.

### 1. Legitimate, Non-Discriminatory Reason

Weaks decided to promote Childs to Cell Leader based on his direct observation and supervision of both candidates, and her higher 2011 evaluation score. (*Id.* at 4–5; Aff. of Tom Weaks ("Weak Aff.") at ¶ 7, D.E. 50-7.) Weaks noted that Childs trained employees at the Cell Leader level, was the department's highest producing Assembler, and covered for other Cell Leaders when necessary. (*Id.*) Childs received a 3.88/5.0 on her 2011 evaluation, while Artis received a 3.5/5.0.[3] (*Id.*) She also had more seniority as an assembler in Department 2195. (*Id.* ¶ 5.) "Selecting a more qualified candidate constitutes a legitimate, non-discriminatory reason." *Hawkins v. Memphis Light Gas and Water*, 520 F. App'x 316, 319 (6th Cir. 2013) (citing *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 815 (6th Cir. 2011)). This legitimate and non-discriminatory reason shifts the burden of production back on Artis to "point out 'evidence from which a jury could reasonably reject [Finishing Brand's] explanation'" as pretextual. *Davis v. Cintas Corp.*, 717 F.3d 476, 491 (6th Cir. 2013) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).

### 2. Pretext

---

[3] In his affidavit, Weaks states that Artis received a 3.5/4.0 and Childs a 3.88/4.0, but this appears to be a typographical error as both employees' 2011 evaluations have a scoring range of 1-5. (D.E. 67-2 at 1; D.E. 67-3 at 1.) Regardless, Childs had a higher 2011 evaluation score.

Pretext is generally demonstrated by showing "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the adverse employment action], or (3) that they were insufficient to motivate [the adverse employment action]." *Rachells v. Cingular Wireless Emp. Servs., LLC*, 732 F.3d 652, 668 (6th Cir. 2013) (internal quotation marks and internal citations omitted). In some situations, "[t]he relative qualifications of candidates can establish triable issues of fact as to pretext where the evidence shows that either (1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified if not better qualified than the successful applicant, and the record contains other probative evidence of discrimination." *Id.* (internal quotation marks and internal citations omitted). Artis asserts that Weaks's reasons for promoting Childs were pretextual because he was the plainly superior candidate, or, alternatively, he was as qualified, if not more qualified than Childs, and the record contains other probative evidence of discrimination sufficient to establish pretext. (D.E. 56 at 6–12.)

### a.    Qualifications

While Plaintiff admits Childs was qualified for the Cell Leader position, (Pl.'s Resp. to Def.'s SUMF at ¶ 16, D.E. 57), he contends that, after considering the job description and individual interview matrix categories, it is clear that he was the plainly superior candidate such that no reasonable employer would have promoted her. (D.E. 56 at 6–9.)

### i.    *Job Description*

The job description listed the position's primary responsibilities as "coordinat[ing] activities that bring all cell team members to the same level of competency." (D.E. 68 at 1.) Further, "[c]ell leaders direct, supervise, mentor, schedule or delegate employees in assign [sic] cell locations," and "report all attendance issues, policy issues, and employee [sic] excessive

leaving cell location." (*Id.*) Cell Leaders are expected to "[p]rovide direction and monitoring of the production operations, to enhance the quality, skills, and productivity of the Industrial Assembly Cells, including training, workload analysis, work assignments, kanban reviews, monitor efficiency, vacation scheduling and attendance and execute ongoing plans for continuous cost and quality improvement." (*Id.*) Some duties listed under the "Requirements" section include the organization of parts, orders, daily communication with management and the cell members, as well as being proactive for any issues that might arise. (*Id.* at 1.) Finally, an applicant "[m]ust have excellent communication and human relation skills with employees and co-workers. Must also have good technical and mechanical comprehension of the functions of products, tooling and work methods. Must be decisive and have the ability to react to problems, which arise on an ongoing basis. Must have good reading, writing and mathematical skills." (*Id.* at 2.) It is undisputed that organization is a key quality for Cell Leaders, as they are required to order and organize thousands of pump parts. (Def.'s SUMF ¶¶ 20–21, D.E. 48.)

In his Cell Leader application, Artis indicated that he had been with Department 2195 for two years, was "capable of training according to blue prints and experience," that he possessed interpersonal and organizational skills, that he had previously led morning exercises, distributed the daily cell reports, collected data for spike, current, and later orders, maintained the Kan-Bans in nine cells, and was putting away deliveries and resetting reorder points. (D.E. 50-1 at 28.) He referenced his prior experience as a temporary assistant cell leader in the buffing department. (*Id.*; Artis Dep. at 109–10, D.E. 50.)

Childs began working at FB in 2005 as a temporary employee and was hired permanently in June 2006. (Dep. of Sherry Childs ("Childs Dep."), D.E. 69 at 11–12.) She listed her assembling and organizational skills, her ability to pick up on tasks easily, and her prior

experience as a quality tech at another company as reasons why she was qualified for the Cell Lead position. (*Id.* 16–17.) Childs had been in Department 2195 for approximately four years prior to applying for the position. (D.E. 61-1 at 40.) In her application, she stated that she had experience completing all of the thirteen requirements listed in the job description while working for Defendant. (*Id.*)

Weaks testified that Childs was his most productive assembler and could "assemble circles around other people, other assemblers." (Weaks Dep. at 106, D.E. 61.) Weaks directly supervised Childs for approximately four years, and Artis for approximately two years, prior to selecting her for the position. (Weaks Aff. ¶ 5, D.E. 50-7.) Weaks recalled that Childs covered for other Cell Leaders when they were out, acted as his assistant when unusual issues arose, and helped train other employees at the Cell Leader level. (*Id.* ¶ 7.) Weaks stated that while both candidates were qualified, based on his observations and her 2011 evaluation score, she was more qualified. (*Id.* ¶¶ 6–7, 9.) Based on both applicants' qualifications, nothing in the Cell Leader job description demonstrates that Plaintiff was the plainly superior candidate.

### ii. *Interview Matrices*

Both candidates were interviewed by Weaks and Day in March 2012.[4] (Weaks Aff. ¶¶ 4, 6, D.E. 50-7.) The interviewers completed interview evaluation matrices by giving each candidate a numerical score ranging from 1–4 in five individual categories: (1) Degree/Diploma Requirement; (2) Experience; (3) Skill/Knowledge In Decision Making; (4) Skill/Knowledge in Leadership; and (5) Interpersonal. (D.E. 67 at 1.) Weaks scored Childs 17/20 and Artis 16/20. (*Id.*) Day stated that Weaks conducted both interviews similarly, and asked each applicant the same questions. (Day Dep. at 557, D.E. 63-1.)

---

[4] While Day and Weaks both participated in the interviews, the promotion decision was made by Weaks. (Weaks Dep. at 94–95, D.E. 61; Day Dep. at 556–57, D.E. 63-1.)

Artis spends several pages of his responsive brief analyzing the individual matrix categories in an effort to establish that he was the plainly superior candidate. (*See* D.E. 56 at 6–9.) He disputes the four he received in the "Degree/Diploma" category, but it was the maximum score available. (D.E. 67 at 1.) Childs received a three. (*Id.*) Artis claims that a year prior to the interview Weaks told him to "go back to school" if he wanted to qualify for any future Cell Lead positions, but that Weaks never told Childs she needed more education. (D.E. 56 at 7.) Regardless of what Weaks told Plaintiff, he scored higher than Childs in this category.

Plaintiff contests Weaks giving him a three, and Childs a four, under the "Experience" category, (D.E. 56 at 7), but it is undisputed that she had more experience as an assembler. Artis offers Tyus's deposition testimony to bolster his superior experience claim, but Tyus did not join Department 2195 until after Childs was promoted, so his testimony on this issue is irrelevant. (*See* Tyus Dep. at 17, 26, D.E. 69-1.) Day testified that Artis had more experience, but admits that Childs had been an assembler in Department 2195 longer. (Day Dep. at 546, D.E. 63-1.) It is unclear how Day would have personal knowledge of Artis's experience as an assembler, since he did not work in Department 2195. To the extent Artis offers this testimony for the purpose creating a genuine issue of material fact as to whether he was the plainly superior candidate, the Court must disregard it. *See Haley v. Gen. Elec. Co.*, 3 F. App'x 240, 248 (6th Cir. 2001) ("Without more, mere opinions expressed by co-workers who have no direct involvement in the decision-making processes have no probative value as to [defendant's] alleged discriminatory intent."). Weaks, who directly supervised both candidates, described Childs as his best and most experienced assembler. (Weaks Aff. ¶ 7, D.E. 50-7.)

As for "Skill/Knowledge in Decision-Making", Artis contests his score of two, and Childs's score of four, since he was performing a majority of the Cell Lead duties while the

position was vacant. (D.E. 56 at 7–8.) Weaks testified that Plaintiff had problems trouble-shooting certain pump assembly issues, but he disputes this, claiming that he has only had trouble with one pump out of hundreds. (Artis Dep. at 232–33, D.E. 50; Weaks Dep. at 74–75, D.E. 61.) Regardless, Weaks testified that Childs was his best assembler, that she had the ability to train other employees at a Cell Leader level, had been covering for absent Cell Leaders when needed, and had been acting as his assistant when unusual issues arose. (Weaks Aff. ¶ 7, D.E. 50-7.).

In the "Skill/Knowledge in Leadership" category, both candidates were awarded a score of three. (D.E. 67 at 1.) Artis believes he deserved higher, based on Childs's workplace demeanor, which Plaintiff and other employees described as unprofessional. (D.E. 56 at 8.) Again, Weaks testified that Childs was the highest producing assembler and had been training other employees at a Cell Leader level. (Weaks Aff. ¶ 7, D.E. 50-7.) For the "Interpersonal" category, Artis contests Weaks giving him a four, but this was the maximum score allowed. (D.E. 56 at 8–9.)

In light of this evidence, no reasonable jury could find that Artis was "a plainly superior candidate, such that no reasonable employer would have chosen [Childs]." *Provenzano*, 663 F.3d at 815. It is undisputed that Childs had more experience as an assembler, was training employees at a Cell Leader level, and was the department's highest producing assembler, according to Weaks. In the end, both candidates were qualified for the position. Weaks, based on his personal observation of the candidates, selected Childs. No evidence offered by Plaintiff "conclusively establish[es] that [he] should have been promoted over [Childs]." *Id.* at 816; *Bartlett v. Gates*, 421 F. App'x 485, 491 (6th Cir. 2010) (finding that the plaintiff had not shown he was the plainly superior candidate, even though he had sixteen years more experience,

superior educational credentials, and superior communication skills as compared to the candidate who ultimately received the promotion).

Plaintiff can still attempt to show pretext by establishing that he and Childs were equally qualified and offering "'other probative evidence of discrimination.'" *Provenzano*, 663 F.3d at 817 (quoting *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627 (6th Cir. 2006)). Artis meets the first requirement, as Weaks had observed they were equally qualified to be Cell Leader. (Weaks Aff. ¶ 6, D.E. 50-7.)

### b.     Other Probative Evidence of Discrimination

Artis offers the allegations of several current and former FB employees, statistical data, and other incidents as examples of the discriminatory atmosphere at Defendant's Jackson, Tennessee facility. He insists that this probative evidence of discrimination is sufficient to create an issue of fact as to whether Weaks's reasons for promoting Childs were pretextual. (D.E. 56 at 9–12.) In evaluating evidence of pretext, the Sixth Circuit has explained:

> Circumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff. While evidence of a discriminatory atmosphere may not be conclusive proof of discrimination against an individual plaintiff, such evidence does tend to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff.

*Rachells*, 732 F.3d at 665 (quoting *Risch v. Royal Oak Police Dep't,* 581 F.3d 383, 392 (6th Cir. 2009)). The parties disagree on the analysis the Court should engage in when deciding whether the evidence offered by Plaintiff establishes the existence of a discriminatory atmosphere at Defendant's business. (*Compare* D.E. 56 at 11 *and* D.E. 88 at 3–4 *with* D.E. 84 at 3–5.)

Artis maintains that the Court, "[i]n determining whether discriminatory behavior constitutes circumstantial evidence of a discriminatory atmosphere . . . may consider factors such

as the identity of the speaker, the nature and substance of the comments, and the temporal proximity of the comments to the challenged decision." (D.E. 88 at 4.) FB counters by suggesting that Plaintiff's examples are actually "other acts" evidence, and the Court's relevancy analysis should focus on whether the same actors are involved, the temporal and geographic proximity of the other acts, whether the various decision-makers knew of the other decisions, whether the employees were similarly situated, and the nature of the employees' allegations. (D.E. 84 at 4.) Both rely on *Griffin v. Finkbeiner*, 689 F.3d 584 (6th Cir. 2012) to support their respective positions. In *Griffin*, the Sixth Circuit was reviewing the district court's grant of summary judgment in favor of the employer on the plaintiff's race discrimination claims, and the granting of the defendant's motion in limine to exclude "other acts" evidence offered by the employee in support of her retaliation claim. *Id.* at 588.

In considering the district court's grant of summary judgment on the race discrimination claims, the *Griffin* court held that a defendant's "discriminatory comments can qualify as evidence that a particular decision was discriminatory if the speaker was 'in a position to influence the alleged decision.'" *Id.* at 595 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998)). Racially insensitive statements can be "sufficient evidence of racial animus only if they [had] some connection to the decision to terminate [plaintiff]." *Id.* These statements could be direct or circumstantial evidence of discrimination. *Id.* An example of direct evidence would be a defendant uttering racially insensitive statements that mentioned a plaintiff by name; while circumstantial evidence would require the court to consider "the identity of the speaker, the nature and substance of the comments, and the temporal proximity of the comments to the challenged decision." *Id.* The court noted that "[i]n certain circumstances, even statements by a non-decisionmaker can be probative evidence of discrimination, such as

when the speaker holds a management position, the statements are commonplace or made in a relevant context (such as a meeting in which personnel decisions are made), or where other evidence of animus exists." *Id.* at 596 (citing *Risch*, 581 F.3d at 393). However, "[e]ven if made by a relevant speaker, '[i]solated and ambiguous' comments will not support a finding of discrimination." *Id.* (quoting *Ercegovich*, 154 F.3d at 355). While the *Griffin* court dealt only with discriminatory statements made by a party, subsequent decisions from this Circuit have expanded the scope of what qualifies as relevant evidence of a discriminatory atmosphere sufficient to establish pretext.

In *Rachells v. Cingular Wireless Employee Servs., LLC*, 732 F.3d 652 (6th Cir. 2013), the Sixth Circuit, in reversing the district court's grant of summary judgment in favor of the defendant employer on the plaintiff's race discrimination claim, held that affidavits from the plaintiff's co-workers were sufficient to establish pretext because they provided evidence of a discriminatory atmosphere. *Id.* at 655, 669. The plaintiff in *Rachells* was terminated during a reduction in force conducted by the defendant. *Id.* at 658. Plaintiff alleged that during his employment with Cingular, there was "a general atmosphere of hostility toward African-Americans" that came directly from the manager of the plaintiff's division. *Id.*

To satisfy his burden of showing that the defendant's proffered termination reason was pretextual, the plaintiff offered affidavits from two former co-workers. *Id.* at 669. The affidavits stated that the division manager promoted a Caucasian employee over more qualified minority candidates, that the promoted Caucasian employee gave lower evaluation scores to minority employees, and the division manager was unresponsive to minority employees' complaints about those discriminatory practices. *Id.* The manager discussed in the co-workers' affidavits was the same one who made the ultimate decision to terminate the plaintiff. *Id.* at 657.

The *Rachells* court held that the incidents were "probative of pretext 'because [they] cast doubt on the basis in fact of Defendant's proffered legitimate, non-discriminatory reasons.'" *Id.* at 669 (quoting *Bartlett*, 421 F. App'x at 492. The *Rachells* court held that district courts, in determining "whether discriminatory atmosphere evidence is probative of discrimination in a particular case," should consider "'the [actor]'s position in the [employer's] hierarchy, the purpose and content of the [conduct], and the temporal connection between the [conduct] and the challenged employment action, as well as whether the [conduct] buttresses other evidence of pretext." *Id.* at 665 (quoting *Risch*, 581 F.3d at 392). The court cautioned that "'evidence of a . . . discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment.'" *Id.* at 665 (quoting *Risch*, 581 F.3d at 393).

In reviewing the district court's exclusion of testimony from non-party employees regarding their own experiences dealing with retaliation by the defendant, the *Griffin* court held that "[i]n the employment-discrimination-law context, 'other acts' evidence consists of testimony or other evidence of discrimination by the employer against non-party employees." 689 F.3d at 598. Expanding on the Supreme Court's holding in *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 380–81, 387 (2008), that lower courts should not apply a per se rule "excluding 'other acts' testimony from non-parties alleging discrimination by supervisors who did not play a role in the challenged decision," the *Griffin* court instructed district courts to consider the "temporal and geographic proximity, whether the various decisionmakers knew of the others decisions, whether the employees were similarly situated in relevant respects, or the nature of each employee's allegations" in deciding whether to admit "other acts" evidence. *Id.* at 598–99. Deciding the relevance of "other acts" evidence is "a case-by-case determination that 'depends

on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case.'" *Id.* at 598 (quoting *Mendelsohn*, 552 U.S. at 388.)

In a recent unpublished decision, the Sixth Circuit expanded on the factors laid out in *Griffin* and directed district courts analyzing the relevance of "other acts" evidence in the employment discrimination context to consider: "(1) whether the evidence is logically or reasonably tied to the decision made with respect to the plaintiff; (2) whether the same 'bad actors' were involved in the 'other' conduct and in the challenged conduct; (3) whether the other acts and the challenged conduct were in close temporal and geographic proximity; (4) whether decision makers within the organization knew of the decisions of others; (5) whether the other affected employees and the plaintiff were similarly situated; and (6) the nature of the employees' allegations." *Shrack v. R+L Carriers, Inc.*, 565 F. App'x 441, 445 (6th Cir. 2014) (citing *Griffin*, 689 F.3d at 599); *Baskin v. Pepsi MidAmerica Co.*, No. 5:13-CV-00030-TBR, 2015 WL 420210, at *5 (W.D. Ky. Jan. 30, 2015) (characterizing testimony from plaintiff's co-worker describing defendant-employer's discriminatory atmosphere as "other acts" evidence whose relevance must be analyzed pursuant to the factors set forth in *Griffin's* discussion of "other acts" evidence).

After reviewing cases both before and after *Griffin v. Finkbeiner*, the Court finds that Plaintiff has offered evidence that is properly characterized and analyzed as discriminatory atmosphere evidence, and evidence that is properly characterized and analyzed as "other acts" evidence. *Compare Griffin*, 689 F.3d. at 595–96 *with* 598–600. Artis's evidence concerning actions taken by or involving Weaks, or actions taken by a non-decisionmaker who could have influenced Weaks's decision to promote Childs, will be analyzed as discriminatory atmosphere evidence, since it was Weaks who ultimately made the decision to promote Childs. *See Rachells*, 732 F.3d at 669 (holding that the evidence of discriminatory atmosphere involving the division

manager was "probative of individualized discrimination in the case of [plaintiff's] termination, because it 'add[s] 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff.'") (quoting *Risch*, 581 F.3d at 392). Plaintiff's evidence "consist[ing] of testimony or other evidence of discrimination by the employer against non-party employees," *Griffin*, 689 F.3d at 598, will be analyzed as "other acts" evidence under the factors set forth in *Shrack v. R+L Carriers, Inc.*.

### i.    *Jerry Day*

Artis offers Day's September 14, 2012 EEOC charge and deposition testimony as evidence of FB's discriminatory atmosphere. (D.E. 56 at 9–11.) In his charge, Day claims he was subjected to race discrimination and retaliation while employed at FB from January 1, 2010 through August 13, 2012 because he received unequal pay as compared to similarly situated Caucasian employees, had a different job classification compared to the Caucasian employee he replaced and similarly situated Caucasian employees at other FB facilities, was told by FB management not to promote African Americans or post certain positions if African Americans expressed interest, was not placed on Defendant's list for employment advancement, and was subjected to harassment after making internal complaints about racial discrimination—including written reprimands and termination. (D.E. 71-1 at 1–4.)

The Court finds the charge to be "other acts" evidence. Applying the *Shrack* factors, however, the Court finds the charge too attenuated to support Plaintiff's "theory of the case." *Mendelsohn*, 552 U.S. at 388. Day's allegations have no logical connection to Weaks's decision to promote Childs, as Weaks played no part in anything related to Day's employment. Day's allegations do not include Weaks, who supervised a different part of the facility. While Day's allegations arose at the same time and place as Plaintiff's claims, Day does not allege that Weaks

played any part in the discrimination he allegedly endured. Artis and Day are not similarly situated, as the latter worked in HR, while Plaintiff worked as an assembler. Finally, Day alleges unequal pay and unlawful termination based on his race, while Plaintiff claims racial discrimination in Defendant's decision not to promote him to Cell Leader.

Artis also offers Day's testimony that, prior to posting the Cell Leader position, FB's management, including Weaks, conducted a closed-door meeting and decided to promote Childs. (D.E. 56 at 9.) Day was briefed afterwards by Battle, who allegedly told him Childs was going to be promoted to Cell Leader. (Day Dep. at 501, D.E. 63-1.) Day told Battle the position had to be posted first, and it eventually was. (*Id.* at 501–02.) On March 1, 2012, Day sent an email following this meeting to Defendant's HR Director that stated "Bob met with Tom Weeks [sic] and Kim Quick to discuss their load. They recommend the following changes. . . . Post position of Cell Leader over pumps. Their recommendation is Sherry Childs. Not sure if I agree." (*Id.* at 502; D.E. 65-2 at 29.) This testimony is probative in determining whether Weaks's reasons for promoting Childs were pretextual and will be considered below.

### ii.     *Dawn Partee's EEOC Charge*

Plaintiff offers Dawn Partee's November 5, 2013 EEOC charge as evidence of FB's discriminatory atmosphere. (D.E. 71 at 1–5.) In her charge, Partee claims she was subjected to race discrimination, retaliation and a hostile work environment from January 1, 2011 through September 17, 2013 while employed at FB based on her superiors' heightened scrutiny of her actions as compared to Caucasian employees. (*Id.* at 1.) She recalls a November 2012 incident where she left the facility to move her vehicle and was followed by an unnamed supervisor who asked what she was doing. (*Id.*) Partee claims she applied for a Distribution Associate position in March 2013, but was told it was no longer available. (*Id.*) She contends that her race was the

reason the posting was removed. (*Id.*) Partee states that on May 13, 2013 she was wrongly accused of shipping an incorrect part and received a reduction of $1.00 per hour in pay. (*Id.* at 2.) Partee also recalls that Kurtz changed her job description without putting the changes in writing, which made it impossible for her to do the job properly. (*Id.* at 4.) Finally, she alleges that Kurtz did not include her on informational meetings in which similarly situated Caucasian employees attended. (*Id.*)

The Court finds the charge to be "other acts" evidence. Applying the *Shrack* factors, the Court likewise determines Partee's EEOC charge too attenuated to support Plaintiff's "theory of the case." *Mendelsohn*, 552 U.S. at 388. Her allegations have no logical connection to Weaks's decision to promote Childs, as Weaks played no role in deciding anything related to Partee's employment with Defendant. Partee's allegations do not involve Weaks, and while her claims arose at the same time and place as Plaintiff's claims, she does not allege that Weaks participated in any part of the discrimination she allegedly endured. Plaintiff and Partee are not similarly situated, since she was a temporary employee who worked in Defendant's warehouse. While they both allege discrimination based on race, Plaintiff's claim involves a failure to promote, while Partee's involves wrongful termination.

### iii.     *Edna Terry's EEOC Charge*

Artis presents Edna Terry's October 16, 2014 EEOC charge as evidence of FB's discriminatory atmosphere. (D.E. 71-2 at 1–2.) In her charge, Terry claims she was subjected to race, sex, and age discrimination, retaliation and violations of the Lilly Ledbetter Act from January 1, 2012 through the present while employed at FB. (*Id.* at 1.) Terry insists she was promised a pay raise when she took a position in FB's warehouse but never received it. (*Id.*) She claims that after Day's employment was terminated, she received verbal and written

warnings at a higher rate than similarly situated Caucasian employees. (*Id.*) Terry recalls applying for a Warehouse/Distribution Production Supervisor position that was later removed. (*Id.* at 2.) Terry also alleges that Defendant had a policy of removing open positions once African American employees showed interest. (*Id.*) She states that a Caucasian male was awarded the Production Supervisor position in March 2013, and that she was required to train him. (*Id.*) Terry further claims that she is subjected to greater workplace scrutiny as compared to Caucasian employees and that she has been exposed to an ongoing pattern of discrimination while at FB. (*Id.*) Terry contends that she is paid less than a similarly situated Caucasian employee in violation of the Lily Ledbetter Act. (*Id.*)

The Court holds the charge to be "other acts" evidence. Applying the *Shrack* factors, the Court finds the charge too unrelated to support Plaintiff's "theory of the case." *Mendelsohn*, 552 U.S. at 388. Her allegations have no logical connection to Weaks's decision to promote Childs, as Weaks played no role in anything related to Terry's employment with Defendant. Terry's allegations do not include Weaks, and while they arose at the same time and place as Plaintiff's claims, Terry does not allege that Weaks took part in the discrimination she allegedly endured. She is not supervised by Weaks, as she holds the position of Cell Leader in Defendant's warehouse. Plaintiff and Terry are not similarly situated, since she is a Cell Leader and Plaintiff is an Assembler. Finally, their claims are not similar, as Terry alleges claims based on gender and age discrimination in addition to race discrimination.

### iv.     *Steven Smith's EEOC Charge*

Plaintiff offers former FB employee Steven Smith's July 1, 2013 EEOC charge as evidence of FB's discriminatory atmosphere. (D.E. 71-3 at 1–4.) In the charge, Smith claims he was subjected to race and disability discrimination and retaliation while employed at FB from

January 1, 2012 through May 14, 2013. (*Id.* at 1.) During 2012, Smith's son began experiencing behavioral problems which required him to take leave from work. (*Id.*) He insists that, while he never exceeded his accrued leave time, he was subjected to negative treatment by his supervisors for taking leave while Caucasian employees did not receive the same treatment. (*Id.* at 2.) Smith states that Weaks subjected him to a hostile work environment. (*Id.*) He alleges that an unnamed employee said "[Smith] won't make it back here." (*Id.*) Smith also contends that Childs referred to him as "sorry" and that his workload was increased beyond that of similarly situated Caucasian employees. (*Id.*) He related several incidents where Weaks was unfair to him as compared to Caucasian employees. (*Id.* at 3–4.) After being demoted, his employment was terminated on May 14, 2013. (*Id.* at 4.) This charge is relevant discriminatory atmosphere evidence that is probative in determining whether Weaks's reasons for promoting Childs were pretextual and will be considered below.

### v. *Statistical Information*

Plaintiff highlights the lack of African American supervisors or managers at Defendant's Jackson, Tennessee facility as evidence of a discriminatory atmosphere. (D.E. 56 at 10.) However, it is undisputed that African Americans hold five out of seven cell leader positions at the facility. (*See* D.E. 57 ¶ 31.) Artis has not provided any statistical evidence as to how many minorities are qualified to apply for management positions, or how many management positions have been available at the facility. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 761–62 (6th Cir. 2000) (finding as inadmissible, evidence related to the percentage of minority supervisors at the defendant's facilities because the plaintiff did not establish the number of qualified minorities available in each labor market).

Plaintiff claims that African American employees are disciplined at a rate of 8:1 as compared to Caucasian employees, and that this suggests a discriminatory atmosphere. (D.E. 56 at 10.) He does not explain the basis for this figure, but states that he obtained it from "a reliable source", *i.e.*, Jerry Day. (*See* D.E. 57 ¶ 52.) This is not sufficient to demonstrate pretext, as "data relied on to support an inference of discrimination must be from a reliable source and must be of sound methodology." *Anderson v. Otis Elevator Co.*, 923 F. Supp. 2d 1032, 1061 (E.D. Mich. 2013) (citing *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1466 (6th Cir. 1990)). Plaintiff's data is neither, since Day testified that he did not review every personnel file before reaching his conclusion. (Day Dep. at 686–90, D.E. 64.) Day simply states that during his employment with Defendant, he recalled eight black employees receiving disciplinary write-ups as compared to one Caucasian employee. (*Id.* at 690–91.) Because the statistical information offered by Plaintiff lacks a sound methodology or reliable source, it is not evidence of Defendant's discriminatory atmosphere.

### vi. *Rubber Chicken*

Sometime in 2012, Plaintiff and other FB employees saw a rubber chicken hung from a noose in the window of an unfinished office addition. (D.E. 56 at 9; Artis Dep. at 199–203, D.E. 50.) Artis did not report the incident. (*Id.* at 201–02.) The chicken remained in the window for more than a day, but was taken down soon after. (*Id.*) Day testified that Tate Scott, an FB employee, was in charge of building the addition. (Day Dep. at 249, D.E. 62-1.) Day removed the rubber chicken and it was never seen again. (*Id.* at 250–51.) Weaks testified that he had heard the rubber chicken was hidden "in someone else's workplace" as a funny joke. (Weaks Dep. at 2–3, D.E. 61-1.) Weaks recalled that the chicken was removed because it was interfering with the employees' productivity. (*Id.* at 3.) This incident was isolated and far removed from

whether Weaks's reasons for promoting Childs were pretextual and does not "'add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff.'" *Rachells*, 732 F.3d at 669 (quoting *Risch*, 581 F.3d at 392). Because Plaintiff has not connected Weaks, or anyone who could have influenced the promotion decision to this incident, it is not evidence of Defendant's discriminatory atmosphere.

### vii.    Danny Selph

Sometime in 2012, Selph gave Plaintiff books by Bill Cosby and Wellington Boone that he found while cleaning his shed. (D.E. 56 at 10; Selph Dep. at 21, D.E. 70-3.) He relayed that he and Artis were not buddies, but he knew that Artis was a Christian. (*Id.* at 21–22.) Selph thought it would be "a nice gesture" to give the books to him instead of throwing them away. (*Id.*) He relayed that Artis never told him he was offended by the books. (*Id.* at 103.) Selph remembered Plaintiff saying that the books "would be good in the library at [his] church." (*Id.*) He never directly supervised Artis. (*Id.* at 104.)

Plaintiff viewed this interaction differently, testifying that as he was walking down the hall at work, Selph told him he had some books for him, but that he "brushed it off and went on." (Artis Dep. at 251, D.E. 50.) The next day, Artis found the two books on his work table. (*Id.*) Artis stated that upon receiving these books he was offended and "began to cry." (*Id.* at 253.) Plaintiff believed the subject of both books focused on diminishing who African Americans are culturally. (*Id.* at 255–56.) He testified that he did not know Selph's intention in giving him these two books. (*Id.* 254–55.) Artis recalled that Selph did not tell him to focus on any particular part of either book. (*Id.* at 256.) Plaintiff confirmed that he never complained to Selph about the contents of the books. (*Id.* at 261–62.)

Again, this incident is far removed from whether Weaks's reasons for promoting Childs were pretextual, and in no way "'add[s] 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff.'" *Rachells*, 732 F.3d at 669 (quoting *Risch*, 581 F.3d at 392). Selph took no part in the promotion decision and was not involved in any meetings that could have impacted that decision. Therefore, this is not evidence of Defendant's discriminatory atmosphere.

### viii. *Bathroom*

Artis recalled finding a drawing of a Ku Klux Klansman and an African-American man kissing, with the caption "What has the South come to?" in the men's restroom while at work. (D.E. 56 at 10; Artis Dep. at 193–99, D.E. 50.) He testified that this incident occurred more than five years before his deposition, which took place on January 22, 2014. (*Id.* at 196.) This incident therefore likely occurred sometime in 2009 and has no connection to whether Weaks's reasons for promoting Childs were pretextual. This incident provides no additional rationale "to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff." *Rachells*, 732 F.3d at 667 (internal citation omitted). Once the cartoon was reported, it was removed and never seen again. (Artis Dep. at 194, D.E. 50.) Plaintiff has not explained how this incident impacted Weaks's decision to promote Childs. He has not alleged that Weaks, or anyone in management, was involved in placing this drawing in the men's restroom. Therefore, it is not evidence of Defendant's discriminatory atmosphere.

### ix. *Bob Battle*

Sometime in 2011, Jerry Day filed an internal complaint alleging that Battle used racially discriminatory remarks towards him and another employee. (D.E. 56 at 11; D.E. 72 at 1–2.) After conducting an investigation, Schultz, Defendant's HR director, concluded that Battle had

not made racial remarks to Day, but did inappropriately use the term "Mexican" in addressing another employee. (*Id.*; Dep. of Betty Schultz ("Schultz Dep.") at 54–55, D.E. 75-1.) Battle was required to attend diversity and sensitivity training. (D.E. 72 at 1.) According to Schultz, Battle completed this training. (Schultz Dep. at 9, D.E. 76-1.) Plaintiff submits an email that Battle sent in December 2011 to the course instructor informing him that he had not been keeping up with the journal that the two men had discussed. (D.E. 77-1 at 1.) As noted, Day related that Battle attended a closed-door meeting with Weaks in March 2012 to discuss job vacancies, including the Cell Leader position in Department 2195. (Day Dep. at 501, D.E. 63-1.) This testimony is probative in determining whether Weaks's reasons for promoting Childs were pretextual and will be considered below.

### *x. Conclusion*

After considering all of the evidence submitted by Plaintiff, the Court finds that only Day's testimony, the 2011 investigation of Bob Battle, and Smith's EEOC charge are probative evidence of a discriminatory atmosphere at FB. Considering that evidence, in the light most favorable to Plaintiff, the Court finds that a reasonable jury could not conclude that Weaks's reasons for promoting Childs were pretextual. The evidence does not "cast[] doubt on the basis in fact of Defendant's proffered legitimate, non-discriminatory reasons" for promoting Childs. *Rachells*, 732 F.3d at 669 (internal quotation marks and internal citation omitted).

Day alleges that Weaks, Battle, and another manager made the decision to promote Childs to Cell Leader at a closed-door meeting before the job was posted. (Day Dep. at 501–02, D.E. 63-1.) At the outset, the Court finds that Battle was not the ultimate decisionmaker as to which candidate would be promoted. Weaks testified that:

> Q:   And obviously we're here, in part, because Ms. Childs was selected for
> that position?

> A:      Uh-huh, yes.
>
> Q:      Who made that decision?
>
> A:      I did.

(Weaks Dep. at 92, D.E. 61.)  Later in his deposition, Weaks stated:

> Q:      If you make a decision about who is cell leader, who do you get to approve that?
>
> A:      Well, it would have been – ultimately it would have been Bettly Schultz, you know, going through the –
>
> Q:      Okay.
>
> A:      -- the process.
>
> Q:      All right.  Would you get Bob Battle's recommendation or when Bob leaves the operation Pete Kurtz's approval before you take it to Betty Schultz?
>
> A:      Yes.  I mean, it would – yeah, his approval, his blessing, sounds good.

(*Id.* at 139–40.)   Plaintiff has not established that anyone besides Weaks was the ultimate decisionmaker with respect to the Cell Lead promotion, or that Battle actually approved the promotion in this case.

Following the March 2012 meeting, Day sent an email to Schultz on March 1, 2012, which stated that the attendees had recommended Sherry Childs for Cell Lead.  (D.E. 68-2.) Day's email also stated that Stevie Thomas, an African American male, was the recommended choice for Cell Leader over shipping.  (*Id.*)  At his deposition, Day testified that the email should have stated that the meeting participants had not recommended, but had decided to promote Childs to Cell Leader.  (Day Dep. at 502–03, D.E. 63-1.)  While "management's consideration of an impermissible factor in one context may support the inference that the impermissible factor entered into the decisionmaking process in another context," *Ercegovich*, 154 F.3d at 356,

nothing in Day's testimony would allow a reasonable jury to infer that anyone at this March 2012 meeting, including Weaks, considered any impermissible factors, such as Plaintiff's race, in making their recommendations.

In another instance, Day testified that Battle told him not to post a Production Supervisor[5] position because he did not want to hire "another black." (Day Dep. at 187, D.E. 62-1; *Id.* at 481, D.E. 63-1.) Plaintiff insists that this incident occurred around the time Childs was promoted, and is proof that management's consideration of race in regards to one promotion decision is probative evidence of pretext in his failure to promote case. (D.E. 56 at 9.) The Sixth Circuit has held that "discriminatory remarks, even by a nondecisionmaker, can serve as probative evidence of pretext." *Risch*, 581 F.3d at 393 (citing *Ercegovich*, 154 F.3d at 356–57). At his deposition, Day testified:

> Q:     Do you recall Bob saying something like, Blacks only like?
>
> A:     I heard him saying that he don't want a black in a position.
>
> Q:     You heard Bob say the words, I don't want a black in a position?
>
> A:     Um-hum. And he was referring to Edna Terry for the production supervisor position. And he got mad.
>
> Q:     What do you recall Bob saying?
>
> A:     That he didn't want Edna Terry in that position.
>
> Q:     Oh, okay. So you heard Bob say –
>
> A:     He didn't want a – I heard Bob say he didn't want a black in the position. When I asked him, What's wrong with Edna Terry, She's qualified, She has twenty years experience, he said, I don't want Edna Terry in that position. It was a black first, and then he called her name.
>
> Q:     Okay. You remember that pretty specifically?
>
> A:     I sent Ms. Schultz an e-mail. You should have that e-mail as well.

---

[5] This position is also referred to as a "Distribution Supervisor".

Q:      Okay.  So the e-mail you sent to Ms. Schultz about Bob's opinions about putting Edna Terry in this position should be a fair, accurate assessment of what Bob said?

A:      Um-hum.  Um-hum.

Q:      Okay.

. . . .

A:      That's it right there.  (Exhibit P was marked.)

Q:      Have you seen Exhibit P before?

A:      Yes.

Q:      Can you identify it for the record?

A:      It's an e-mail that I sent to Betty Schultz concerning Bob making statements of hiring a minority for production – a handicapped minority, and cursing me, using, None of my f'ing business.

Q:      Okay.  We'll start with the first one.  On March 11, 2011, Bob stated we need to hire a handicap minority for production manager.

A:      Um-hum.

Q:      Tell me about that conversation.

A:      That was during the time that we was [sic] getting ready to post the production supervisor position and a cell leader position.  From that meeting that Bob had with – Mr. Battle had with Mr. Tom Weaks and Ms. Kim Quick, it was decided that they would hire Kay Meadows and Sherry Childs.  This was before the interviews have taken place and the posting have came [sic] down.  I told Bob at the time, I said, Bob, we have to go by the procedures to post this position and bid the position, and the highest bidder would be able to be qualified and get the position.  And then he was upset, and he said, Why don't you just hire a handicap minority for the position?

. . . .

Q:      Okay.  You testified earlier that this happened in a meeting where you said that certain decisions were made before job postings were made; is that correct?

A:      Yes.  Um-hum.  Yes, ma'am.

(Day Dep. at 186–90, D.E. 62-1.)  The email, identified as "Exhibit P", was dated March 11, 2011, and sent almost a year before Childs was promoted to Cell Leader.  It is unclear from Day's testimony when Battle made the comment about not wanting to hire another African American.  The Production Supervisor position was also discussed at the March 2012 meeting, and Kay Meadows was recommended for the position.  (D.E. 68-2.)  Day sent an email on April 2, 2012 to Schultz stating that Battle wanted to remove the Production Supervisor posting because Meadows withdrew her name, even though three other employees had applied.  (D.E. 66-1 at 88.)

The Sixth Circuit has noted, "[w]e do not mean to imply that any [discriminatory] comment by a corporate executive is relevant as evidence of a discriminatory corporate culture. Rather, the courts must carefully evaluate factors affecting the statement's probative value, such as the declarant's position in the corporate hierarchy, the purpose and content of the statement, and the temporal connection between the statement and the challenged employment action . . . as well as whether the statement buttresses other evidence of pretext." *Ercegovich*, 154 F.3d at 357 (internal quotation marks and internal citations omitted).   Here, Battle was in charge of Defendant's Jackson, Tennessee facility, the purpose and content of his statement was that he did not want to post a position because he did not want another African American employee to be hired, the temporal connection between Battle's comment and Childs's promotion is unclear, since Day's testimony on when the comment was made is inconsistent.  Battle's comment, while offensive, was isolated and does not "'buttress[] other evidence of pretext.'" *Id.*  There is no evidence that Battle said this comment to anyone but Day.  It would be unreasonable to infer that Battle mentioned his opposition to hiring a minority candidate at the March 2012 meeting since

the attendees recommended that Stevie Thomas, an African American, be promoted to Cell Leader of the shipping department. (D.E. 68-2; Day Dep. at 508, D.E. 63-1.) Plaintiff has failed to explain how the Production Supervisor opening was eventually filled, other than providing Terry's statement in her EEOC charge that it was filled by a Caucasian male in 2013. At this stage of the *McDonnell Douglas* inquiry, Plaintiff has the burden of producing evidence establishing that Defendant's reasons were pretextual. Even drawing all reasonable inferences in Plaintiff's favor, this single comment by Battle, which may have occurred a year before the promotion decision at issue, is not enough to rebut the legitimate, non-discriminatory reasons for promoting Childs.

Similarly, while Battle's 2011 comment to an FB employee was inappropriate, it was also isolated. Defendant conducted an independent investigation of Day's complaint and determined that Battle should attend diversity training. (D.E. 72 at 1.) According to Schultz, Battle completed that training. (Schultz Dep. at 9, D.E. 76-1.) This incident occurred more than a year before Weaks promoted Childs. (D.E. 72 at 1.) Weaks testified that he would get Battle's approval or blessing before finalizing the Cell Lead promotion, (Weaks Dep. at 140, D.E. 61), but that the promotion decision was ultimately his. (*Id.* at 146–47.) While true that "discriminatory comments can qualify as evidence that a particular decision was discriminatory if the speaker was 'in a position to influence the alleged decision,'" *Griffin*, 689 F.3d at 595 (quoting *Ercegovich*, 154 F.3d at 355), the 2011 comment by Battle is the kind of "'[i]solated and ambiguous' comment[] that will not support a finding of discrimination." *Id.* (quoting *Ercegovich*, 154 F.3d at 355). Plaintiff has not shown how this comment establishes that the legitimate, non-discriminatory reasons for promoting Childs were pretextual.

In his EEOC charge, Smith stated that he began "experiencing a hostile work environment and attitude from his supervisor, Tom Weaks." (D.E. 71-3 at 2.) Smith contends that Weaks stated it was "not my problem," when Smith asked for time off to attend to a mechanical problem at his home. (*Id.* at 3.) Smith claims that Weaks, on more than one occasion, gave him the wrong parts list, which caused him to ship the incorrect parts and receive verbal reprimands and write-ups. (*Id.*) Smith's charge is not probative of individualized discrimination in Plaintiff's case because it contains conclusory allegations that do not shed light on whether Weaks's reasons for promoting Childs were prextual. Unlike the co-workers' affidavits in *Rachells* that described numerous, specific incidents where the defendant had been nonresponsive to minority employees' complaints, and had promoted lesser qualified Caucasian employees rather than minority employees, Smith's claims do not provide concrete examples of discrimination by Weaks that sufficiently serve as probative evidence that his reasons for promoting Childs were pretext for race discrimination in Plaintiff's case.

None of the evidence offered by Plaintiff "cast[s] doubt on the basis in fact of Defendant's proffered legitimate, non-discriminatory reasons" for promoting Childs. *Bartlett*, 421 F. App'x at 492 (internal citation omitted). The Court's role in Title VII cases "is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments.'" *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (quoting *Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999)). Because no reasonable juror could find that Weaks's lawful reasons for promoting Childs were pretext for race discrimination, Defendant is entitled to summary judgment on these claims. They are therefore DISMISSED.

## B.    **Hostile Work Environment**[6]

### 1.    *Statute of Limitations*

Defendant challenges some of the factual allegations underlying Plaintiff's hostile work environment claim on timeliness grounds, insisting that the THRA's statute of limitations precludes the Court from considering these time-barred incidents.  (D.E. 47-1 at 8–9.)  A claim under the THRA must be filed "within one (1) year after the alleged discriminatory practice ceases . . . ."  Tenn. Code Ann. § 4-21-311(d).  "A discrete discriminatory act 'ceases' as of the time it occurs, not as of the time the consequences of the act cease."  *Booker v. Boeing Co.*, 188 S.W.3d 639, 645 (Tenn. 2006).  The "THRA's one year limitations period for bringing a direct court action is not tolled while administrative charges are pending with the THRC or the EEOC."  *Burnett v. Tyco Corp.*, 932 F. Supp. 1039, 1044 (W.D. Tenn. 1996).

In some instances, however, acts occurring outside the THRA's one-year limitations period can be considered.  The Tennessee Supreme Court recognizes the 'continuing violation' exception, which "allows a plaintiff to bring a claim for discriminatory conduct that occurs outside the limitations period if the discriminatory conduct is sufficiently related to conduct occurring within the limitations period."  *Booker*, 188 S.W.3d at 643.  The Tennessee Supreme Court recognizes two instances in which this exception applies:

> The first category arises where there is some evidence of present discriminatory activity giving rise to a claim of a continuing violation, for example where an employer continues to presently impose disparate work assignment[s] or pay rates between similarly situated employee groups.  Keys to establishing this exception is proof that at least one of the forbidden discriminatory acts occurred within the relevant limitations period.

---

[6] Defendant contends that Plaintiff's Title VII hostile work environment claim is not properly before the Court because he failed to allege the claim in his EEOC charge.  (D.E. 47-1 at 7 n.1.)  Plaintiff concedes this, but states that the claim was also brought pursuant to the THRA.  (D.E. 88 at 9.).  Therefore, the Court DISMISSES his Title VII hostile environment claim.  *See Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (affirming district court's grant of summary judgment in favor of the defendant after the plaintiff did not contest the arguments raised in defendant's motion).

> The second category of "continuing violation" arises where there has been a longstanding and demonstrable policy of discrimination such as an established and repeated pattern of paying men more than women. To constitute such an established pattern, the plaintiff must clearly demonstrate some "overarching policy of discrimination," and not merely the occurrence of an isolated incident of discriminatory conduct.

*Id.* (quoting *Spicer v. Beaman Bottling Co.*, 937 S.W.2d 884, 889–90 (Tenn. 1996)). This exception does not apply to discrete incidents or individual acts of discrimination; it applies when discriminatory acts take place over time. *Id.* at 643–44. In this context, "discrete" refers to something that is "separate and distinct; not attached to others; unrelated." *Id.* at 648. Plaintiff's complaint was filed on March 12, 2013. (D.E. 1.) Therefore, to be within the THRA's limitations period, the discriminatory practices at issue would have needed to cease no earlier than March 12, 2012, or be sufficiently related to conduct occurring within the limitations period to avoid being time-barred.

In support of his hostile work environment claim, Artis recalled finding a clipped drawing of a Ku Klux Klansman and an African-American man kissing with the caption "What has the South come to?" in the men's restroom at work. (D.E. 56 at 15; Artis Dep. at 193–99, D.E. 50.) Plaintiff testified that this incident occurred at least five years prior to his deposition, which took place on January 22, 2014. (*Id.* at 196.) Plaintiff informed management about the drawing and it was removed. (*Id.* at 194.) This isolated incident is the kind of discrete discriminatory practice that is time-barred by the THRA's statute of limitations. Artis has not connected this one act to any present discriminatory activity, or shown that the cartoon was part of a longstanding and demonstrable policy of discrimination by the Defendant. *See Booker*, 188 S.W.3d at 643. While Plaintiff testified that there was currently some offensive writing and symbols—including a swastika—on a toilet paper dispenser at work, (Artis Dep. at 197, D.E.

50), this is the kind of separate and distinct activity to which the 'continuing violation' exception would not apply. Plaintiff could not recall when he saw the offensive writing on the toilet paper dispenser, but only that it "always been there." (*Id.*) He "cannot use the continuing violation doctrine to link [a] distant event[] to those incidents that took place within the limitations period." *El-Zabet v. Nissan N. Am., Inc.*, 211 F. App'x 460, 465 (6th Cir. 2006). Therefore, this incident is time-barred and cannot be considered by the Court.

### 2. Remaining Discriminatory Practices

Turning now to the acts that are not time-barred, THRA hostile work environment claims are analyzed using the same standards as the equivalent Title VII claim. *See Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008). To succeed on a claim of a racially hostile work environment, a plaintiff must demonstrate that "(1) [he] belonged to a protected group, (2) [he] was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act." *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011). The parties' arguments focus on the third and fourth elements.

### a. Based on Race

FB insists that several incidents of alleged harassment relied on by Plaintiff were not based on his race. (D.E. 47-1 at 11; D.E. 84 at 16–17.) "[T]he third element limits the scope of [the] analysis: only harassment based on the plaintiff's race may be considered." *Williams*, 643 F.3d at 511. "A plaintiff may prove that harassment was based on race by either (1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Id.*

"Harassment is based on race when it would not have occurred but for the plaintiff's race; the harassing conduct need not be overtly racist to qualify." *Id.* (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007)).

### i.        *Sherry Childs*

Artis refers to his workplace interactions with Childs as evidence of a hostile work environment. (D.E. 56 at 15.) He recalled Childs stating, "People need to do their damn job." (Artis Dep. at 136, D.E. 50.) Plaintiff was offended by Childs's profanity, but was not sure if this comment was directed at him. (*Id.*) He remembered two employees telling him that Childs called him a "Facebook Christian" and "Biblethumper", but that she never said those names directly to him. (*Id.* at 136–37.) Plaintiff did not report the name-calling, but did complain to Weaks and Kurtz about Childs speaking to other employees about his job performance. (*Id.* at 142–43.) He testified that, while at a morning meeting, he got into a verbal altercation with Childs after she told the meeting attendees that they could not leave until she was finished speaking. (*Id.* at 143–44.) Plaintiff told Childs she was being very rude, at which point she stuck her thumb two-to-three inches from his face. (*Id.* at 144–47.) Plaintiff reported this incident to Kurtz. (*Id.* at 147–48.)

Artis described an incident on February 14, 2013 when he left his work station to use the restroom. (*Id.* at 149.) After finishing, Plaintiff ran into Kurtz, who told him that several people were looking for him, and that Childs told Weaks that Plaintiff had been absent for thirty minutes. (*Id.* at 149–50.) Weaks was waiting at Plaintiff's workstation and the two discussed the allegation. (*Id.* at 150.) Plaintiff disputed the length of time he was supposedly away, and told Weaks that Childs was lying. (*Id.*) He recalled that Childs corrected her story and said that he might have been away only fifteen minutes. (*Id.* at 153–54.) Kurtz decided that all of the

parties, including Artis, Weaks, and Childs, needed to meet and discuss the working conditions in Department 2195. (*Id.* at 156.) Plaintiff, feeling "emotionally, just broken," did not want to meet the next day. (*Id.*) Instead, the parties conducted a formal meeting in September 2013, where Plaintiff and Childs discussed their frustrations and apologized to each other. (*Id.* at 273–75.) Artis admitted that after the meeting "that hostility is no longer there between [them.]" (*Id.* at 277.) He stated that he would feel comfortable going to Kurtz if any other issues arose, and that he and Childs were now working together. (*Id.* at 277–78.)

Artis has not provided any direct evidence that Childs's workplace treatment was based on his race. None of her actions or comments involved the use of race-specific or derogatory terms. His comparative evidence is also unpersuasive. Tyus, an employee in Department 2195, stated, in response to the question, "Have you ever seen Sherry spaz out at a white employee?" that "[Childs] cuts everybody's throat." (Tyus Dep. at 56, D.E. 69-1.) Weaks testified that Childs "can make mountains out of molehills," in regards to workplace interactions. (Weaks Dep. at 145, D.E. 61.) No reasonable jury could conclude that these incidents were based on Plaintiff's race. Therefore, they will not be considered for the purposes of Plaintiff's hostile work environment claim.

### ii.       *Bob Battle*

At a date unknown, but sometime after Artis filed his June 26, 2012 EEOC charge, he was assisting Kay Meadows in Defendant's shipping and receiving department. (D.E. 56 at 15; Artis Dep. at 267–68, D.E. 50.) After completing his tasks, Battle told Artis "Your job is done here." (*Id.* at 268.) Artis recalled that he had finished working on a specific job when Battle made this comment. (*Id.*). He interpreted Battle's comment as hostile. (*Id.*)

Artis offers no direct evidence that Battle used any race-specific or derogatory terms. His comparative evidence is equally unavailing, as Tyus testified that he felt comfortable going to Battle if he was being discriminated against. (Tyus Dep. at 59, D.E. 69-1.) Tyus described Battle as a good guy with a "dry sense of humor," and "real business oriented like." (*Id.*) In the times that Tyus has interacted with Battle, it has "never been nothing negative." (*Id.* at 60.) Tom White, Battle's supervisor, testified that Tate Scott and Kim Quick, two Caucasian employees, had lodged complaints about Battle's attitude and demeanor, and that his management style is best described as "my way or the highway." (Tom White Dep. at 28–30, D.E. 78.) No reasonable jury could conclude this incident was based on Plaintiff's race. Therefore, it will not be considered for the purposes of Plaintiff's hostile work environment claim.

### iii.    *Bathroom Monitoring*

Artis asserts that African American employees do not have the same privileges as Caucasian employees, which includes enhanced bathroom monitoring. (D.E. 56 at 15; Artis Dep. at 165.) The basis for this claim is Plaintiff's own observations[7], which are insufficient to raise a genuine issue of material fact. *See Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 724 (6th Cir. 2006) ("It is well settled that mere personal beliefs, conjecture and speculation are insufficient to support an inference of discrimination.") (internal quotation marks and internal citation omitted). Therefore, this incident will not be considered for the purposes of Plaintiff's hostile work environment claim.

### b.    **Severe or Pervasive**

---

[7] Plaintiff claims that other African American employees have experienced bathroom monitoring, (D.E. 56 at 15), but provides no support for this assertion.

The remaining examples of severe or pervasive racial harassment alleged to have occurred include: (1) the rubber chicken hung in an unfinished office; (2) two books given to Plaintiff by Selph; (3) Childs's racial comments; (4) the phrase "You people" being uttered at African American employees by unnamed FB employees; (5) generalized mistreatment of African American employees; and (6) bathroom graffiti. (D.E. 56 at 14–15.). Defendant contends it is entitled to summary judgment on this claim because these incidents do not rise to the level of severe or pervasive harassment sufficient to alter the conditions of Plaintiff's employment and create an abusive working environment. (D.E. 84 at 13–17.)

"To assess the fourth prong of an asserted prima facie case, [the Court] must examine the totality of the circumstances." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009) (citing *Harris v. Forklift Sys., Inc.* 510 U.S. 17, 23 (1993)). In considering the totality of the circumstances, courts look at "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23)); *Craig-Wood v. Time Warner N.Y. Cable LLC*, 549 F. App'x 505, 510 (6th Cir. 2014) ("'Harassment' is actionable under a hostile work environment theory if 'the alleged conduct constituted an unreasonably abusive or offensive work-related environment or adversely affected the employee's ability to do his or her job.'") (quoting *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1079 (6th Cir. 1999)).

"Under this totality-of-circumstances test, 'the issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case.'" *Waldo v. Consumers Ener. Co.*, 726 F.3d 802, 814 (6th Cir. 2013) (quoting *Williams v. Gen. Motors*

*Corp.*, 187 F.3d 553, 562 (6th Cir. 1999)). "This analysis contains an objective and subjective component." *Craig-Wood*, 549 F. App'x at 510 (citing *Harris*, 510 U.S. at 21). "The environment must be of the sort that 'a reasonable person would find hostile or abusive,' and the [plaintiff himself] must 'subjectively perceive the environment to be abusive.'" *Id.* (quoting *Bailey*, 526 F.3d at 886). Merely offensive conduct does not establish a hostile work environment. *See Harris*, 510 U.S. at 21. The plaintiff must describe conduct that "unreasonably interfere[es] with [his] work performance and creat[es] an objectively intimidating, hostile, or offensive work environment." *Grace v. USCAR*, 521 F.3d 655, 658 (6th Cir. 2008).

### i.      *Chicken*[8]

The "chicken" episode occurred sometime in 2012, when Artis saw a rubber chicken hanging by a noose in the window of an unfinished office. (Artis Dep. at 200–01, D.E. 50.) He did not report the incident. (*Id.* at 201–02.) The chicken remained hanging for more than a day, but was taken down soon after. (*Id.*)

### ii.      *Selph*

Sometime after June 2012, Selph gave Artis two books that he found while cleaning his shed. (Selph Dep. at 21, D.E. 70-3.) While Selph thought it would be "a nice gesture" to give the books to Artis, Artis viewed this differently, testifying that, upon receiving the books, he was offended and "began to cry." (*Id.* at 253.)

### iii.      *Childs*

Artis testified that Childs made two racially offensive comments after being promoted to Cell Leader in March 2012. (*Id.* at 129–32.) One involved her saying, "I can get it here faster

---

[8] Artis could not recall the exact time he saw the rubber chicken. For the purposes of this motion, drawing all reasonable inferences in favor of the non-moving party, the Court will consider this incident as having occurred within the THRA's statute of limitations.

with a boatload of Chinese children," in regards to a printer not arriving on time.  (*Id.* at 129.)
The second incident involved Childs asking Artis if he was talking about Ethiopia after Artis told
a story to Tyus about airline pilots' low salaries.  (*Id.* at 130–31.)  Artis stated that Childs did not
say anything about Ethiopia being a poor black country, but that he interpreted her comment as
racially offensive.  (*Id.* at 131–33.)  Artis did not say anything to Childs after she made either
comment.  (*Id.* at 129–30, 134.)  Tyus testified that someone told him Childs said something
about Ethiopia, but that he was not present when she made the comment.  (Tyus Dep. at 58, D.E.
69-1.)

### iv.      *"You people"/Discriminatory Atmosphere*

Artis claims that African-American employees are called "you people", but testified that
he could not recall a single time when this occurred.  (D.E. 56 at 15; Artis Dep. at 293, D.E. 50.)
Based on this testimony, the Court will not consider this allegation for the purposes of Plaintiff's
hostile work environment claim.  *See Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 719
(6th Cir. 2012) ("We cannot assume Plaintiff[] [was] aware of those things that [he] did not
discuss in hundreds of pages of depositions.  Such an assumption would overstep the reasonable
inferences we are obliged to draw in favor of the non-moving party on summary judgment.").
Similarly, Plaintiff offers the discriminatory atmosphere evidence to bolster his hostile
environment claim.  (D.E. 56 at 15.)  While a court may consider instances in which a plaintiff
"gained second-hand knowledge of a particular incident of harassment," *Berryman*, 669 F.3d at
719–20, Plaintiff has not explained whether he knew about the incidents referenced in his co-
workers EEOC charges.  Therefore, these will not be considered for the purposes of Plaintiff's
hostile work environment claim.

### v.      *Offensive Graffiti*

The offensive writing on the toilet paper dispenser in Defendant's restroom is not the kind of reprehensible graffiti that has been found sufficient, along with other incidents, to support a hostile work environment claim. *See Armstrong v. Whirlpool Corp.*, 363 F. App'x 317, 326 (6th Cir. 2010) (finding that the plaintiff's viewing of racist graffiti in the workplace restroom over a nineteen year period was sufficient, taken in consideration with other incidents, to allow his hostile work environment claim to survive summary judgment).

### *vi.* *Conclusion*

Left with these remaining allegations, Plaintiff has "ultimately failed to show that the alleged harassment was 'severe or pervasive.'" *Michael*, 496 F.3d at 601 (quoting *Harris*, 510 U.S. at 21.) These examples were not severe. While a rubber chicken hanging from a noose may be offensive, it was never seen again after it was taken down. Childs's two comments, and Selph giving Plaintiff two books, does not rise to the level of conduct that is "physically threatening or humiliating." *Harris*, 510 U.S. at 23; *Curry v. SBC Commc'ns, Inc.*, 669 F. Supp. 2d 805, 835 (E.D. Mich 2009) ("It is true that the noose by itself is not as compelling a case for a hostile work environment as it would be with other racially-charged comments.").

These incidents were also not pervasive. The chicken incident occurred sometime in early 2012, while Selph gave Artis two books sometime after June 2012. Childs's comments were also isolated—Artis could only recall two instances where she used racially connected language after her promotion in March 2012. *See Clay*, 501 F.3d at 707–08 (holding that fifteen specific incidents of Caucasian employer disciplining African American employee harsher than similarly situated Caucasian employees spanning a two-year period were mere offensive utterances and not actionable under Title VII). Even if Plaintiff's discriminatory atmosphere evidence is considered, these incidents occurred over a period of years. A majority of the

employees' allegations do not involve the kind of severe or pervasive acts necessary to support a hostile work environment claim. *See Wixson v. Dowagiac Nursing Home*, 87 F.3d 164, 171 (6th Cir. 1996) (holding that the plaintiffs failed to create issue of fact by alleging numerous instances of disparate treatment and hostile work environment in conclusory terms with no reference to names, times, and occasions). It is also questionable whether Plaintiff had second-hand knowledge of the incidents alleged by his co-workers. Defendant is entitled to summary judgment on this claim. It is therefore DISMISSED.

## C.    <u>Retaliation</u>[9]

FB asserts Plaintiff's THRA retaliation claim fails as a matter of law because certain supervisors had no knowledge of his EEOC charge, and, alternatively, he never suffered an adverse employment action. (D.E. 47-1 at 15–16; D.E. 84 at 18.) Defendant states that Plaintiff was never demoted, reassigned, or disciplined, and, in fact, received a pay increase and favorable evaluation following the filing of his EEOC charge. (D.E. 47-1 at 15–16.)

Artis highlights several incidents following the filing of his EEOC charge that he believes shows retaliation by Defendant, including: (1) Childs subjecting Plaintiff to "relentless abusive behavior at work," such as "vent[ing] against him," and talking about his job performance to other employees; (2) Weaks becoming overly critical of Plaintiff's work, allowing Childs to act in an abusive way towards him, and blaming him for mistakes that were not his fault; (3) Selph giving Plaintiff two books, and assisting in monitoring his bathroom breaks; (4) stripping Plaintiff of Cell Leader duties; (5) removing Plaintiff from the management track; and (6) Battle

---

[9] Defendant insists that Plaintiff's Title VII retaliation claim is not properly before the Court since he failed to allege retaliation in his EEOC charge. (D.E. 47-1 at 15.) Plaintiff concedes this, but states that the claim was also brought pursuant to the THRA. (D.E. 56 at 17.) Therefore, the Court DISMISSES his Title VII retaliation claim. *See Brown*, 545 F. App'x at 372.

telling Plaintiff that his "job is done here." (D.E. 56 at 19–20.) Plaintiff asks the Court to also consider the discriminatory atmosphere evidence. (*Id.*)

The THRA makes it unlawful to retaliate against an employee for opposing a discriminatory practice or filing a charge of discrimination that is prohibited under the statute. *See* Tenn. Code Ann. § 4-21-301(1). The analysis for THRA retaliation claims is identical to the analysis used for Title VII retaliation claims. *Bailey*, 526 F.3d at 885 n.1. In cases such as this, where there is no direct evidence of retaliation, a THRA retaliation claim is analyzed using the *McDonnell Douglas* burden-shifting framework. *See Davis v. FedEx Corp. Servs., Inc.*, No. 11-2902, 2014 WL 1216518, at *9 (W.D. Tenn. Mar. 24, 2014).

Under this framework, Plaintiff must show that he (1) engaged in a protected activity; (2) that his superiors knew of his protected conduct; (3) that his superiors took an adverse employment action against him after his protected conduct, and (4) that there was a causal connection between the exercise of Plaintiff's protected right and the adverse employment action taken by his superiors. *See Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir. 2014). If Plaintiff makes out his prima facie case, the burden shifts to FB to produce a legitimate, non-retaliatory reason for its action. *Id.* If FB produces a sufficient explanation, the burden shifts back to Plaintiff to put forward competent evidence from which a reasonable jury could conclude the stated reason was pretextual. *Id.* It is undisputed that filing an EEOC charge is protected conduct. FB disputes whether Selph or Childs knew that Artis filed an EEOC charge[10], and whether it took any materially adverse action against him. (D.E. 47-1 at 15–16; D.E. 84 at 18–19.)

---

[10] Defendant first raised the "knew of protected conduct" argument in its reply. (D.E. 84 at 18.) Plaintiff filed a motion requesting permission to submit a sur-reply addressing "new arguments regarding retaliation that Defendant made in its reply." (D.E. 86-1 at 2.) The Court granted this request in order to "further aid [Plaintiff] in

1.      *Knew of Protected Conduct*

Artis must demonstrate that "the individuals charged with taking the adverse employment action knew of the protected activity." *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002). This can be done by direct or circumstantial evidence. *Id.*  Selph testified that he was not aware Artis filed an EEOC charge when he gave him the books in June 2012. (Selph Dep. at 105, D.E. 70-3.)  Childs related that she first became aware of Artis's complaints not long after he filed this suit on March 12, 2013.  (Childs Dep. at 71, D.E. 69.)  Artis conceded that he did not know who at FB was aware that he filed an EEOC charge.  (Artis Dep. at 242–43, D.E. 50.)  He was only "sure it's not a very quiet-kept thing." (*Id.* at 243.)  When asked directly, Plaintiff was not sure if Childs knew about his EEOC charge.  (*Id.* at 243–44.)

Based on the evidence, Plaintiff has not presented specific facts that would permit a jury to infer that Childs or Selph knew about his filing of the EEOC charge.  *See Mulhall*, 287 F.3d at 552 (holding that "conspiratorial theories" are not enough to show a retaliating actor knew of plaintiff's protected activity).  Plaintiff has not provided any dates when Childs subjected him to relentless and abusive behavior at work, except for the February 14, 2013 incident, but Childs testified she had no knowledge of Plaintiff's complaints until he filed this suit in March 2013. Artis has failed to raise a factual dispute regarding whether his protected activity was known to Childs or Selph.  *See Kyle-Eiland v. Neff*, 408 F. App'x 933, 941 (6th Cir. 2011) (affirming district court's dismissal of retaliation claim because the defendant "squarely denie[d] any knowledge" of plaintiff's protected activity and the plaintiff presented no evidence suggesting otherwise).  Therefore, these incidents will not be considered for the purposes of Plaintiff's retaliation claim.

---

addressing the issues raised in the Defendant's Motion for Summary Judgment."  (D.E. 87 at 1.)  Plaintiff did not address this new argument in his sur-reply.

2.      *Materially Adverse Action*

Plaintiff submits that: (1) Weaks becoming overly critical of his work, allowing Childs to act in an abusive way towards him, and blaming him for mistakes at work that were not his fault; (2) stripping Plaintiff of his Cell Leader duties; (3) removing him from the management track; (4) Battle telling Plaintiff that his "job is done here,"; (5) bathroom monitoring; and (6) discriminatory atmosphere evidence are materially adverse actions because a reasonable employee would have been dissuaded from supporting a discrimination charge. (D.E. 56 at 19–20.)

To sustain a prima facie case of retaliation, "[t]he third element requires a plaintiff to show that 'a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Goodsite v. Norfolk S. Ry. Co.*, 573 F. App'x 572, 582 (6th Cir. 2014) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). This is an objective test, and "'[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work.'" *Id.* (quoting *White*, 548 U.S. at 68). The burden of showing an adverse employment action is "less onerous in the retaliation context than in the anti-discrimination context." *Michael*, 496 F.3d at 595–96.

a.      **Tom Weaks**

Artis contends that Weaks ignored his complaints that Childs was subjecting him to "relentless abusive behavior at work" after he filed his EEOC charge. (D.E. 56 at 19.) However, after Plaintiff complained about Childs's behavior, Kurtz met with all the parties. Artis and Childs apologized to each other and agreed to work better together. There is no evidence that

Weaks condoned Childs's behavior, or that Plaintiff's complaints were ignored. Further, many of the incidents involving Childs fall into the category of petty slights and lack of good manners that rarely constitute adverse employment actions. *See Burlington*, 548 U.S. at 69.

As for Weaks's increased complaints about Plaintiff's work, while "markedly lower performance-evaluation scores that significantly impact an employee's wages or professional advancement may be materially adverse actions," *Vaughn v. Louisville Water Co.*, 302 F. App'x 337, 348 (6th Cir. 2008) (internal quotation marks and citation omitted), it is undisputed that after filing his EEOC charge, Artis received a pay increase and satisfactory score from Weaks on his 2012 performance evaluation. (Pl.'s Resp. to Def.'s SUMF ¶¶ 59–60, D.E. 57.)

### b. Cell Lead Duties/Management Track

Plaintiff contends that Defendant's stripping him of his Cell Lead duties was a materially adverse action. (D.E. 56 at 19.) However, once Childs was promoted to Cell Leader in March 2012, there was no need for the other assemblers to keep performing those duties. There is no evidence that other assemblers kept performing these duties after Childs's promotion such that a jury could infer Plaintiff was the victim of retaliation by the Defendant. Additionally, Childs was promoted in March 2012, which preceded Plaintiff's EEOC charge by three months. This is not the kind of materially adverse action sufficient to support a retaliation claim. *See Agrawal v. Montemagno*, 574 F. App'x 570, 576 (6th Cir. 2014) (holding that to qualify as a materially adverse action, a significant change in employment status must be "more disruptive than a mere inconvenience or alteration of job responsibilities") (internal quotation marks and internal citation omitted).

Artis also claims he was removed from Defendant's management track in retaliation for filing his EEOC charge. (D.E. 56 at 19.) Weaks testified that that the company did not have a

formal "management track," but there was a program in which employees could enroll in continuing education courses and receive reimbursement from the company. (Weaks. Dep. at 155, D.E. 61-1.) While Plaintiff claims he was removed from the track, he admits no one ever told him he had been removed from the informal management track. (Artis Dep. at 182, D.E. 50.) Plaintiff's speculation alone cannot support this claim at the summary judgment stage. *See Grizzell*, 461 F.3d at 724.

### c.  Bob Battle

While Plaintiff asserts that Battle's comment to him at the shipping & receiving department was a materially adverse action, the Court finds this comment was nothing more than a "simple lack of good manners," that does not rise to the level of a materially adverse action. *See White*, 548 U.S. at 68. This incident would not "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotation marks and internal citation omitted).

### d.  Bathroom Monitoring

As noted, Plaintiff's complaint of increased bathroom monitoring is based on his own observations and insufficient to support a retaliation claim at the summary judgment stage. *See Grizzell*, 461 F.3d at 724.

### e.  Discriminatory Atmosphere

Artis does not explain how discriminatory atmosphere evidence is helpful in showing that Defendant took a materially adverse action against him. At this stage of the *McDonnell Douglas* inquiry, the Court must determine whether a plaintiff has produced sufficient evidence to raise a genuine dispute of material fact that a defendant took illegal action in response to the plaintiff's protected conduct. Discriminatory atmosphere evidence is irrelevant in making that

determination because it involves other, non-party employees and generally fails to show what, if any, materially adverse action a plaintiff experienced. *See Clack v. Rock-Tenn Co.*, 304 F. App'x 399, 408 (6th Cir. 2008) (affirming the district court's decision to consider discriminatory atmosphere evidence only after the plaintiff had established a prima facie retaliation case and the defendant had offered a legitimate, non-retaliatory reason). Therefore, this evidence will not be considered for the purposes of whether Plaintiff suffered a materially adverse action.

        **f.**        **Conclusion**

While the burden for showing materially adverse action is lower for a retaliation claim when compared to a discrimination claim, the evidence provided by Plaintiff fails to satisfy this minimal burden. Defendant is entitled to summary judgment on this claim. It is therefore DISMISSED.

*Conclusion*

For the reasons set forth above, Defendant's motion for summary judgment is GRANTED. Plaintiff's complaint is hereby DISMISSED in its entirety.

IT IS SO ORDERED this 19th day of March, 2015.

                                  s/ J. DANIEL BREEN
                                  CHIEF UNITED STATES DISTRICT JUDGE